**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Louis Joseph SALERNO and Frederick Arnold Pandolfo,**
**Defendants–Appellants.**

**Nos. 87–1066, 87–1067.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1989.

Decided May 9, 1990.

Gail Brodfuehrer, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Richard A. Wright, Wright, Shinehauser & Stewart, Las Vegas, Nev., Norman D. James, Pelletier, Supanic & James, Woodland Hills, Cal., and Bruce I. Hochman, Hochman, Salkin & Deroy, Beverly Hills, Cal., for Martin N. Gelfand, defendants-appellants.

Before GOODWIN, Chief Judge, SCHROEDER and BEEZER, Circuit Judges.

SCHROEDER, Circuit Judge:

The appellants, Louis Salerno and Frederick Pandolfo, are former employees of the Stardust Casino in Las Vegas, Nevada. They were charged under 26 U.S.C. § 7206(2) and 18 U.S.C. § 2 with willfully aiding or assisting the preparation of false tax returns of the corporation operating the casino, and they were convicted. In this unusual case, appellants acknowledge that the government proved that there was a scheme which embezzled millions of dollars from the casino. They argue, successfully on appeal, that the government failed to prove the scheme had as a purpose the violation of the federal tax laws. Because our law requires such proof in order to convict for "willfully" aiding or assisting the preparation of a false tax return, we must reverse for insufficiency of the evidence.

Some knowledge of the operation of the casino is necessary in order to understand just what the defendants did. In order to monitor gaming revenue and prevent embezzlements like that which occurred here, the Stardust had an elaborate system of internal controls to inventory accurately the chips won or lost at each gaming table during each shift.

At the beginning of each shift, a count of chips was made and recorded. During the shift, when patrons won chips from this initial inventory, thereby depleting it, a "floorman" or "pit boss" would order more chips by preparing and signing a form called an "order for fill" and handing a copy of it to a "chip runner." The runner would carry it to the casino "cage," which serves as the casino's bank. At the cage the runner would trade his copy of the order to fill for a "fill slip" and the requisite number of chips. He brought the fill slip and chips to a "shift boss" for verification and signature. During the embezzlement scheme, Pandolfo served as the Stardust's shift boss and assistant casino manager. Salerno was the casino manager.

After obtaining the signature of the shift boss, the runner carried the chips and the fill slip to the proper table where the fill slip and the chips were compared to the

original order to fill, the order to fill and the fill slip were dropped into a slot in the gaming table called a "drop box," and the chips were deposited at the table. At every stage of the procedure, multiple copies and multiple signatures were required. Copies of each form were kept at the casino cage and in the drop box under each table.

At the completion of each shift, "inventory cards" compiled from the forms in the drop boxes were compared with the fill slips at the cage, and the win for each table was computed. This computation was made by first taking the total table income for the shift (which included the ending chip inventory and the payments in the drop box for chips purchased during the shift) and subtracting from that amount the opening inventory plus fills. The table wins were eventually recorded on "stiff sheets" and finally posted to the general ledger that was used to prepare the income tax returns.

The government's evidence established that between 1979 and 1981 Salerno, the casino manager, forged dealer signatures in advance on hundreds of fill slips. These forged fill slips found their way into both the drop boxes and the cage with the help of pit boss Pandolfo, a cashier and a runner. The evidence also indicated that Salerno either removed chips or cash from the cage in amounts equal to the forged fill slips. Both the cashier and the runner were indicted and tried with these defendants. The runner, James Frank Gabriele, was acquitted. The cashier, Lawrence Franklin Carpenter, was convicted but his appeal was dismissed following his death.

The scheme was not immediately detected because, as a result of the forgeries, the amount of chips in the cage and on the tables was always matched by fill slips. It appeared that gambling patrons had won the money that in fact had been removed.

The indictment in the case was originally filed in thirteen counts and included charges against the four individual employees who were tried in this proceeding, Trans–Sterling, Inc., which was the parent company of the casino, and the Stardust Hotel/Casino itself. The counts included allegations of mail fraud and racketeering on the part of the corporations and individuals, as well as counts charging the individuals with aiding and abetting the preparation of false tax returns. The theory of the original indictment was that Trans–Sterling Corporation itself was involved in a racketeering scheme with the appellants in order to defraud the Internal Revenue Service of tax revenues.

There followed about two and a half years of pretrial proceedings during which the district court remarked several times that the case appeared to be no more than a state law embezzlement case that lacked any federal nexus. The government subsequently moved to dismiss all counts of the indictment with prejudice except the aiding and abetting of the preparation of false tax return counts against the individuals. This motion was granted in August of 1986. Thus all allegations that the corporation benefited from the alleged conduct of appellants disappeared from the indictment, and the case went to trial solely against the individuals. Salerno was convicted of violating 26 U.S.C. § 7206(2) by aiding in the preparation and presentation by Trans–Sterling of false corporate income tax returns for 1980 and 1981, and Pandolfo was convicted under 18 U.S.C. § 2 of aiding and abetting Salerno in that offense.

The key issue before us is whether the government proved a violation of 26 U.S.C. § 7206(2). A person is guilty of a felony under that section if that person:

Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim or document;

26 U.S.C. § 7206(2).

Accordingly, this court has repeatedly stated that in order to convict under 26

U.S.C. § 7206(2) the government must prove beyond a reasonable doubt (1) the defendant aided, assisted, or otherwise caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful. *See United States v. Crooks,* 804 F.2d 1441, 1448 (9th Cir.1986); *modified,* 826 F.2d 4 (9th Cir.1987); *U.S. v. Dahlstrom,* 713 F.2d 1423, 1426–27 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984).

■ Thus, the government was required to prove that Salerno and Pandolfo "willfully" aided or assisted Trans–Sterling in the preparation of false returns for the years 1980 and 1981. The appellants claim that the government failed to do so and that the convictions must be reversed for insufficiency of the evidence. In reviewing their contentions, we of course view the evidence in a light most favorable to the government. *See U.S. v. Marchini,* 797 F.2d 759, 766 (9th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

The Supreme Court has repeatedly held that in order to make out a "willful violation" of section 7206(2) the government must prove defendants acted with specific intent to defraud the government in the enforcement of its tax laws. *See U.S. v. Bishop,* 412 U.S. 346, 361, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973) (Congress intended to penalize the "purposeful tax violator"); *Ingram v. U.S.,* 360 U.S. 672, 680, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1959) (violator's objective must include evasion of federal taxes); *Spies v. U.S.,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943) (violation requires "willful and positive attempt to evade tax in any manner or to defeat it by any means"); *U.S. v. Murdock,* 290 U.S. 389, 397–99, 54 S.Ct. 223, 226, 78 L.Ed. 381 (1933) (more is needed than acting intentionally and without legal justification; "bad faith or evil intent" must be shown); *see also U.S. v. Krasovich,* 819 F.2d 253, 256 (9th Cir.1987) (conviction re-versed because "[n]othing in the circumstances of the transaction suggests that Krasovich knew that the purpose of the concealment was to evade taxes."); *cf. U.S. v. Young,* 804 F.2d 116, 119 (8th Cir.1986) (specific intent to impede government's computation of proper taxes is sufficient), *cert. denied,* 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987); *Siravo v. United States,* 377 F.2d 469, 472 (1st Cir.1967) (same).

The government in this case thus had to show beyond a reasonable doubt that Pandolfo and Salerno engaged in this scheme not merely for their own benefit but with a specific intent to cause the casino to file false tax returns. Here the government's case founders.

The government at trial identified no persons other than Pandolfo, Salerno, the cashier and the runner as being involved in the scheme. None of the four individuals was an officer, shareholder, or director of the taxpayer corporation. There was no evidence that any of those individuals had anything to do with the preparation of Trans–Sterling's tax returns. There was no evidence linking the embezzlement scheme to any officer, director or shareholder of the taxpayer corporation. There was no evidence that the defendants had any motive for conducting a scheme to defraud the government, or that they ever mentioned their own taxes, much less the tax returns of the casino.

What the evidence did tend to show was that the defendants engaged in a scheme which they, as sophisticated gaming employees, knew would result in the corporation having lower profits and thus paying lower taxes than it otherwise would have paid. The government's basic position, as set forth in its brief, is that "defendants' guilt was established by showing evidence from which the jury could infer the defendants participated in the false fill slip scheme with the knowledge and understanding that the false fill slips would be used by Trans–Sterling's accountants to prepare fraudulent tax returns." The government claims there is support for its theory that knowledge that one's conduct

will result in a false entry in another's tax return is sufficient to satisfy the willfulness requirement of section 7206(2). However, in all the cases cited by the government, the United States proved not only knowledge, but a clear motive to avoid the payment of taxes, either those of the defendant, or of an interested or related party. For example, *United States v. Crum*, 529 F.2d 1380 (9th Cir.1976), involved the defendant's participation in an illegal tax shelter scheme. The conviction for violation of section 7206(2) was upheld because the evidence indicated that the defendant knew about the scheme, and its purposes, and that they helped prepare the false information that was sent to the IRS. *United States v. Perez*, 565 F.2d 1227 (2d Cir. 1977), and *United States v. Maistrow*, 451 F.2d 1342 (2d Cir.1971), each involved "ten percenters" who cashed winning tickets for others at horse races in return for a share of the winnings. In each case it was established that the ten percenter was paid his commission so that the real winner would not have to pay taxes on the winnings. *United States v. Nealy*, 729 F.2d 961 (4th Cir.1984), involved a scheme to obtain false deductions for limited partnerships in coal properties. *United States v. Hooks*, 848 F.2d 785 (7th Cir.1988), involved the concealing and liquidating of bearer bonds by a son-in-law in order to avoid his father-in-law's estate paying the taxes. In *U.S. v. Greger*, 716 F.2d 1275, 1277–78 (9th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), the defendant underreported income on his own return.

Indeed we are aware of no case affirming a conviction where the defendant received no benefit from the filing of the false or fraudulent return. In this case the filing of the corporate return appears irrelevant to the defendant's conduct. The law requires specific intent to defraud the I.R.S. and this means that the government must prove not only that the defendant's conduct affected tax revenue, but that tax fraud was an objective. *See Krasovich*, 819 F.2d at 256 where we enforced that requirement stating, "In sum, the evidence is not sufficient to show that [the defendant] conspired ... with the objective of interfering with the Internal Revenue Service's collection of [any] taxes."

Moreover, were the government's theory in this case to be accepted, any embezzlement or theft by a person knowledgeable about taxes, remaining undetected when the victim's tax return is prepared, would be a violation of section 7206(2). This is not consistent with the statute or the cases interpreting the willfulness requirement.

Recognizing the weakness in its threshold position, the government also asserts that defendants were actually carrying on this scheme "on behalf of the casino's owners," and were thus "assisting the casino itself to conceal gross receipts." The only evidence upon which the government relies to support this assertion is a brief portion of the more than 50 hours of conversation between Pandolfo and Salerno that the government intercepted as a part of its investigation. The central remark of the ten-minute excerpt introduced at trial was Pandolfo's statement to Salerno that it is "aggravating" to see "shit going out while me and you are trying to ... put some on the bottom line." The remark arguably suggested that some other unidentified person or persons, independently or in conjunction with appellants, might have been keeping the casino from making a larger profit. It did not permit the jury reasonably to infer that the defendants were purposefully helping the corporation to file false tax returns. The evidence did not show any complicity between the corporation and the defendants. We therefore need not decide whether such a showing would have been sufficient to permit the jury to infer willful tax fraud.

The appellants also argue that the return filed by the corporation was not even "false as to a material matter," and that for that reason still another element of the crime was not established. The government has argued that line "1c" of the corporation's tax returns was materially false because it failed to indicate undetected embezzlement losses. Defendants have contended that embezzlements are correctly excluded from the line 1c figure under the Tax Code and generally accepted account-

ing principles. While this argument is intriguing, we need not reach it as the government has failed to prove the defendants' willful violation of the statute. Similarly we need not reach the arguments with respect to jury instructions and the separate arguments concerning insufficiency of the evidence as to Pandolfo.

The convictions are REVERSED.