41 F.3d 1508
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David L. THOMAS, Defendant-Appellant.
 No. 94-3249.
 United States Court of Appeals, Sixth Circuit.
 Nov. 15, 1994.
 
 Before: KEITH, WELLFORD, and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-Appellant David L. Thomas ("Thomas") appeals his jury convictions for aiding and assisting in the preparation of false United States income tax returns in violation of 26 U.S.C. Sec. 7206(2). For the reasons set forth below, we AFFIRM Thomas's convictions.
 
 I. Statement of the Case
 
 2
 Thomas, a certified public accountant ("CPA"), owned and operated the David L. Thomas accounting firm in Delaware, Ohio. One of the firm's principal clients was Acock, Schlegel Architects, Inc. ("ASA"). From the late 1970's until 1986, the Thomas firm prepared ASA's corporate tax returns and beginning in 1985, it performed most of ASA's bookkeeping and accounting tasks. Thomas's firm also prepared individual tax returns for Wayne L. Schlegel ("Schlegel") and George Acock ("Acock"), the two principals of ASA, through 1985. Although the Thomas firm prepared ASA's 1986 corporate return, the accounting firm of Deloitte, Haskins, and Sells prepared Schlegel's 1986 individual return.
 
 
 3
 Trial testimony revealed that in addition to overseeing all accounts handled by his firm, Thomas personally controlled all important accounts and all accountants at the firm reported to him. Because ASA was a principal account, Thomas supervised all work performed for ASA and often dealt with Schlegel personally. In addition to reviewing work performed for ASA, Thomas signed all the tax returns and financial statements prepared for ASA and reviewed, and signed as preparer, all the compilation reports.
 
 
 4
 In 1985 and 1986, Schlegel remodeled his home and used corporate funds to pay for the improvements and related purchases. During this time, Schlegel directed ASA's bookkeeper, Martha Schwartzwalder ("Schwartzwalder"), to write checks drawn on corporate accounts to vendors providing goods or services related to his home remodeling. Although the checks were generally drawn directly from the corporate checking account, on several occasions Schlegel directed Schwartzwalder to pay a check from the general account into an account established for a townhouse project, and then to draw a check on the second account for his residential improvements.
 
 
 5
 ASA bookkeeping procedures required crediting or debiting specific corporate accounts for all funds ASA expended. Accordingly, Schwartzwalder accounted for Schlegel's personal expenditures within ASA accounts. Account 165 was established as a research and development account for a townhouse project. According to testimony, however, Thomas and Schlegel decided to use account 165 to write-off expenditures for Schlegel's house.
 
 
 6
 Pursuant to ASA bookkeeping procedures, Schwartzwalder would note on each check stub the appropriate account, and send these stubs to Thomas's office each month. When questions arose about which account should be charged, Schwartzwalder would not code the check stub until she spoke with Thomas's office about the expenditure, or until Schlegel or Thomas indicated the appropriate account. Schwartzwalder explained that Thomas told her to note account 165 on checks used for Schlegel's home expenditures.
 
 
 7
 After receiving the stubs, Thomas's bookkeepers entered them into a computer program which eventually generated a ledger, financial statements, and a compilation report. These documents were used, in turn, to prepare ASA's corporate tax return and the W-2 forms for ASA's principals.
 
 
 8
 At trial, the government's primary witness was Timothy Montague ("Montague") who testified against Thomas under a grant of immunity. Montague worked as an accountant at Thomas's firm from July 1983 until January 1987. Montague testified that he worked for Thomas and reported directly to him on all matters. According to Montague, he began working on the ASA account during the first quarter of 1984. Additionally, Montague prepared ASA's corporate return and Schlegel's individual return for 1985 under Thomas's direction.
 
 
 9
 In 1985, Montague confronted Thomas with concerns about the use of account 165. In response, Thomas told Montague that the amounts coded to account 165 were Schlegel's personal expenses that ASA paid on Schlegel's behalf. Thomas explained that he agreed to write-off these costs to equalize amounts ASA had paid on Acock's behalf.[1]
 
 
 10
 At the end of 1985, although Thomas told Montague account 165 reflected Schlegel's personal expenses, he nonetheless instructed Montague to zero out the posting's to account 165 by expensing them to the advertising, promotion and entertainment account. Montague, although he disagreed with this order, adjusted a journal entry reflecting Thomas's request and noted on such entry: "per DLT."[2] These "adjustments" resulted in an increase in the corporate deductions reported for income tax purposes of $13,169. Schlegel did not report the residential improvement expenses, paid by ASA, as individual income on his 1985 return.
 
 
 11
 In relation to ASA's 1986 corporate return, Marti Wickham ("Wickham"), a staff accountant with Thomas's firm, testified to making similar adjustments reclassifying Schlegel's personal expenses as corporate deductions pursuant to Thomas's direction. The adjusted journal entries moved Schlegel's personal home expenditure amounts from account 145, an asset account for furniture and fixtures, to account 165, the research and development asset account. Wickham then made a separate adjustment moving $24,788.32 from account 165 into a research and development expense account 449. Wickham later prepared ASA's 1986 corporate tax return using the general ledger which reflected ASA's expensing of Schlegel's home improvements. She never questioned Thomas about why these entries were made.
 
 
 12
 In 1985 and 1986, Schlegel did not include as income on his W-2, or on his personal income tax filing, the corporate deductions which paid for his personal expenses. Although a different accounting firm prepared Schlegel's 1986 personal return, the firm relied on W-2's which did not include as personal income the amounts which had been deducted as corporate expenses.
 
 
 13
 In December 1986, the Internal Revenue Service ("IRS") audited ASA. After IRS agent Barbara Ramadas ("Ramadas") contacted ASA, Thomas coordinated the audit and arranged for discussions between his firm and the corporation. According to Montague, over the next several months, Thomas, Schlegel and Montague discussed the audit at three separate meetings. At the first meeting in late 1986 Schlegel presented Thomas and Montague with a list of personal expenses ASA paid on behalf of its principals. Schlegel later compiled a complete list of personal expenses paid by ASA which he gave to Thomas's firm.
 
 
 14
 Thomas and Montague analyzed the lists and prepared a memorandum of potential impact on ASA and the individual principals--including potential tax exposure for the years of 1984 and 1985. Thomas prepared an analysis including references to "R & D--Wayne's residence, $13,169" and to "W/O/ A/R employees, $10,627"[3] as potential tax exposure items. Thomas, Montague, Schlegel and Acock discussed these items at a follow-up meeting. Thomas then directed Montague to prepare a tax-impact list. Thomas used this list at an early 1987 meeting where he explained that because the amounts reflected in the asset accounts were for personal expenditures, they served as compensation to the principals and should not have been written off by ASA without also being reported as income on the principals' personal income tax return.
 
 
 15
 On January 27, 1987, Montague resigned from Thomas's firm and gave two-weeks notice. Because Montague's contract ran from July until July, and because this was the busy tax season, Thomas refused to accept Montague's resignation and sought to hold him to his contract. Later that day, Montague consulted with his lawyer seeking advice about whether he should give ASA's bookkeeper certain invoices he believed ASA would alter--Montague did not tell his attorney he had tendered a letter of resignation earlier that day. After Montague's attorney sought advice from the Ohio Society of CPA's, he prepared Montague's second letter of resignation. After Montague's resignation, Thomas appointed Wickham to work on ASA's audit.
 
 
 16
 Over the next two months the relationship between ASA and Thomas's firm severely deteriorated. Although Thomas terminated all business with ASA by letter dated April 3, 1987, he orally agreed, upon specific request, to prepare ASA's 1986 corporate tax return. Schlegel hired Timothy Foley ("Foley"), an accountant with Deloitte, Haskins and Sells, to prepare his 1986 individual tax return. Foley filed this return on October 19, 1987.
 
 
 17
 Although Foley received no documents from Thomas's firm, in April of 1987, Foley obtained general information relevant to Schlegel's return from Thomas. A November 17, 1987 letter from IRS agent Ramadas alerted Foley to ASA's payment of Schlegel's personal expenses. When Foley confronted Schlegel with this information, Schlegel explained that these payments "evened up" the compensation he felt Acock had received from withdrawals or business trips.
 
 
 18
 In the spring of 1993, a federal grand jury returned a five-count indictment charging Thomas and Schlegel with various counts of tax fraud. Count 1 charged Schlegel and Thomas with conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the IRS in the assessment, computation, and collection of revenue, in violation of 18 U.S.C. Sec. 371. Counts 2 and 4 charged Schlegel with wilfully making and subscribing false United States Individual Tax Returns in the years 1985 and 1986, in violation of 26 U.S.C. Sec. 7206(1). Counts 3 and 5 charged Thomas with wilfully aiding and assisting in the preparation and presentation to the IRS of false United States Individual Tax Returns, in violation of 26 U.S.C. Sec. 7206(2).
 
 
 19
 In April 1993, Thomas pled not guilty and on October 13, 1993, a jury trial commenced. On October 25, 1993, the jury acquitted Thomas of the conspiracy charge but found him guilty of the two charges of aiding and assisting in the preparation of false tax returns (Counts 3 and 5).[4] In March 1994, the district court sentenced Thomas to 12 months incarceration on each count, to run concurrently, followed by 2 years probation. The court suspended six months of incarceration and Thomas began serving his sentence on April 11, 1994. This timely appeal followed.
 
 II. Discussion
 
 20
 On appeal, Thomas argues the district court erred by: (1) limiting Appellant's opening statement; and (2) finding the evidence presented on Count 5 was legally sufficient to support the jury's verdict. We discuss each allegation of error below.
 
 A. Opening Statement
 
 21
 Thomas argues the district court's "refusal to permit Appellant's opening statement, describing evidence pertinent to the accuser [Montague], constitutes reversible error." Noting the critical importance of opening statements, Thomas contends that the district court should have permitted him to provide the jury with a narrative framework discussing Montague's activities and motivations. Although the district court allowed Thomas's counsel to make a statement, on appeal he argues the district court improperly limited its scope. We disagree.
 
 
 22
 District courts retain "discretionary control over opening statements, including the power to exclude irrelevant matters." See United States v. Poindexter, 942 F.2d 354, 360-361 (6th Cir.), cert. denied, 112 S.Ct. 615 (1991) (citing United States v. Zeilie, 734 F.2d 1447, 1455 (11th Cir.1984)). Accordingly, we will not reverse the district court unless there is an abuse of discretion. Id. Stressing the narrow purpose of opening statements, we have limited opening statements to a brief statement of the issues and an outline of what will be supported with competent and admissible evidence. See United States v. Singer, 482 F.2d 394 (6th Cir.), cert. denied, 414 U.S. 1092 (1973).
 
 
 23
 Here, Thomas's counsel began his opening statement by detailing, at length, Montague's resignation from Thomas's firm and discussing Montague's telephone calls and job opportunities. The district court interrupted counsel and the following colloquy took place out of the hearing of the jury:
 
 
 24
 The Court: Mr. Brown, I haven't heard anything yet about the allegations in this case. Your opening statement should be an opening statement, not argument about credibility of witnesses. I don't know where you're going with all this, but it doesn't seem to have anything to do with this case.
 
 
 25
 Mr. Brown: Well, your Honor, ... what I try to do in an opening statement, is to relate a narrative of what happened. And this is very important.
 
 
 26
 The Court: How about a narrative of what happened with respect to the government's charges against your client.
 
 
 27
 Mr. Brown: Your Honor, this is very critical. Because there is one central witness in this case against--
 
 
 28
 The Court: No. Let's move on to the charges involved in this case. You can say that you believe the evidence is going to show that the government's witnesses lack credibility, but let's get on with it. This is too much in the form of argument and it doesn't really have anything to do yet with the government's case. So I want you to move on to that.
 
 
 29
 JA at 96.
 
 
 30
 The district court did not abuse its discretion by interrupting the opening statement and requiring that counsel not argue within his statement. The opening statement did not provide information helpful to the jury in discerning the charges against Thomas, or explain how Montague's resignation related to the charges in the case. The district court did not refuse counsel the opportunity to state that the evidence would show Montague was not a credible witness. Rather, the court properly requested that counsel refrain from presenting the statement in the form of argument.
 
 
 31
 We find the court did not abuse its discretion by limiting counsel's statement. Assuming arguendo the court did err by limiting the statement, any error was harmless because Thomas suffered no prejudice. First, within his opening statement, counsel for Schlegel attacked Montague's weaknesses and inconsistencies. Next, Thomas's counsel extensively cross-examined Montague and reiterated Montague's lack of credibility within his closing argument. No prejudice occurred.
 
 
 32
 B. Sufficiency of the Evidence Presented for Count Five
 
 
 33
 Thomas argues the evidence presented was insufficient to sustain the jury's guilty verdict convicting him of aiding and assisting the preparation of Schlegel's 1986 personal income tax return. Thomas first argues the government's failure to show he had a motive for or benefited from the tax fraud rendered the proof of wilfulness insufficient. He next argues the chain of circumstances connecting him to Schlegel's 1986 return is too remote to support a guilty verdict. We disagree for the following reasons.
 
 
 34
 In reviewing a district court's denial of a motion for judgment of acquittal we consider "the evidence as a whole, taken in the light most favorable to the prosecution, together with all legitimate inferences to be drawn therefrom, to determine 'whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Farley, 2 F.3d 645, 650 (6th Cir.), cert. denied, 114 S.Ct. 649 (1993) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). This holds true even where the evidence is circumstantial, and such evidence need not exclude every reasonable hypothesis except that of guilt. United States v. Prieur, 429 F.2d 1237, 1238 (6th Cir.1970).
 
 
 35
 Further, when considering a motion for judgment of acquittal, neither trial judges nor appellate courts may assess witness credibility. See Glasser v. United States, 315 U.S. 60, 80 (1942). As we stated in United States v. Adamo, "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." 742 F.2d 927, 935 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985).
 
 
 36
 Thomas was convicted of aiding and assisting in the preparation of a false tax return in violation of 26 U.S.C. Sec. 7206(2).[5] The essential elements of 26 U.S.C. Sec. 7206(2) are that:
 
 
 37
 (1) defendant aided, assisted, procured, counseled, advised or caused the preparation of a return;
 
 
 38
 (2) the return was fraudulent or false as to a material matter; and
 
 
 39
 (3) the act of the defendant was wilful.
 
 
 40
 See United States v. Sassak, 881 F.2d 276, 278 (6th Cir.1989) (citing United States v. Hooks, 848 F.2d 785, 788-89 (7th Cir.1988)); see also United States v. Salerno, 902 F.2d 1429, 1431 (9th Cir.1990).
 
 
 41
 Thomas disputes the government's proof with respect to the element of wilfulness. He argues because the government failed to show he had any motive or reason to aid in the preparation of a false return, and because he did not prepare Schlegel's 1986 individual income tax return that the government failed to prove wilfulness. This argument must fail.
 
 
 42
 1. No Proof of Motive Was Required to Show Wilfulness
 
 
 43
 The Supreme Court has defined "wilfully" for the purposes of Sec. 7206(2) as a "voluntary, intentional violation of a known legal duty." See United States v. Pomponio, 429 U.S. 10, 12 (1976); see also Cheek v. United States, 498 U.S. 192, 201 (1991). In Pomponio, the Supreme Court also held that for the purposes of the tax statutes, the term "wilfully" does not require "proof of any motive other than an intentional violation of a known duty." 429 U.S. at 11-12. Additionally, because direct evidence of a person's state of mind is rarely available, the requisite intent under Sec. 7206(2) "may be shown from the surrounding facts and circumstances. No direct proof of intent is necessary." United States v. Barnes, 313 F.2d 325, 327 (6th Cir.1963).
 
 
 44
 Here, the government was not required to present evidence that Thomas expected to gain something from assisting Schlegel in violating the tax laws. The facts and circumstances surrounding Thomas's structuring of transactions designed to defraud the IRS provide sufficient proof of Thomas's intentional violation of a known duty.[6]
 
 
 45
 2. The Causal Nexus Was Sufficient to Sustain a Conviction
 
 
 46
 This Court's decision in United States v. Maius forecloses Thomas's argument that because he did not prepare the 1986 return the government could not prove a sufficient causal nexus. 378 F.2d 716 (6th Cir.), cert. denied, 389 U.S. 905 (1967). In Maius, the panel affirmed the conviction of a defendant who did not participate in the actual preparation of a return and held that a chain of events very similar to the events in this case was sufficient to sustain a conviction under Sec. 7206(2).
 
 
 47
 In Maius, the defendant was a casino manager who prepared the daily sheets used to record the daily net wins and losses. Based on these records, the casino established their annual gambling loss collections. The casino underreported these losses and these false figures were eventually used for the preparation of income tax returns resulting in the understatement of corporate income. The Maius panel noted that the defendant had previously worked as a bookkeeper and was responsible for keeping track of the collections and posting them on the records. Further, the defendant examined the questioned tax returns before they were filed.
 
 
 48
 Based on these activities, the panel found the defendant's activities indicated that he "was involved in conduct to conceal the actual receipt of the corporate income and in accounting for it." 378 F.2d at 718. Moreover, the panel held that defendant's knowledge of the use of altered records in the preparation of tax returns was sufficient to sustain the charge that he wilfully and knowingly aided and assisted. Id ., followed by United States v. Crum, 529 F.2d 1380 (9th Cir.1976) (affirming Sec. 7206(2) conviction where defendant did not prepare any tax returns but did attend two meetings discussing the tax fraud scheme because the defendant knew about the scheme and its purposes).
 
 
 49
 Here, Thomas clearly knew about the scheme to defraud the IRS. He also knew that false records were used to prepare ASA's corporate returns and Schlegel's personal tax returns. Viewing the evidence in the light most favorable to the government, the evidence here supports the jury verdict.
 
 
 50
 Despite Thomas's assertions that he played the role of a figurehead and had no direct contact with the ASA account, the record reflects that Thomas had full control over the account. The evidence shows he wilfully aided and assisted in the preparation of false tax returns. Testimony established that Thomas knew Schlegel received unreported income in the form of corporate expenditures for his home remodeling. In fact, Thomas structured transactions designed to conceal personal expenses as deductible corporate expenditures. This led to false W-2's in 1985 and 1986 and false personal income tax returns in the same years.
 
 
 51
 Thomas is a licensed CPA and a reasonable jury could infer that he knew, and intended, that the "adjustments" to the corporate returns would result in underreporting on Schlegel's personal income tax returns. The fact that Thomas orchestrated this exact scenario for Schlegel's 1985 personal return, supports the inference of his knowledge regarding the 1986 return.
 
 III. Conclusion
 
 52
 For the reasons stated above, we AFFIRM the jury convictions and judgment imposed by the Honorable James L. Graham, United States District Judge for the Southern District of Ohio.
 
 
 
 [1]
 Montague stated that:
 [Thomas] shared with me that [the amounts in account 165] were for personal expenses paid by the corporation on behalf of Wayne Schlegel, and he had lost sleep over the matter because Wayne wanted, and [Thomas] agreed, to write off these research and development costs through the corporation, and that it was a way to even out the amounts that George Acock had received and that was paid by the corporation on his behalf.
 JA at 156-57.
 
 
 [2]
 The adjusted journal entry posted $13,169.61 to advertising, promotion and entertainment account 421, an expense account, and made an offsetting entry of the same amount to account 165, a research and development account
 
 
 [3]
 Montague opined that this notation referred to the expensing and writing off of ASA's accounts-receivable-employees asset account without treating the expensed amounts as compensation to employees. JA at 155-56
 
 
 [4]
 The jury acquitted Schlegel of the conspiracy charge and convicted him for wilfully making false personal income tax returns (Counts 2 and 4). Schlegel has not appealed
 
 
 [5]
 Section 7206(2) provides that any person who
 [w]ilfully aids or assists in, or procures, counsels or advises the preparation or presentation under, or in connection with any matter arising under the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document ... shall be guilty of a felony ...
 
 
 [6]
 Thomas mistakenly relies upon holdings in United States v. Salerno, 902 F.2d 1429 (9th Cir.1990) and United States v. Foy, 794 F.Supp. 835 (M.D.Tenn.1992) which found no wilfulness where the defendants lacked an objective to commit tax fraud. First, the situations in both Salerno and Foy involved underlying conspiracies to embezzle or steal money. In both cases, the defendants intended to, and did, steal or embezzle money. The defendants also falsified documents to conceal their crimes. The accompanying tax fraud resulting from use of falsified documents was purely incidental to the underlying conspiracies
 Here, in contrast, the underlying scheme was to defraud the IRS by hiding personal income as corporate deductions. More importantly, Thomas did not engage in a theft or embezzlement which incidentally led to false filings; instead he helped structure transactions designed to hide personal income from the IRS. In fact, Thomas concedes that his accounting firm classified Schlegel's personal home renovation expenses as corporate research and development costs. JA at 8. This situation is infinitely different from those addressed in Salerno and Foy.