# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

DAVID L. SMITH,
        *Defendant-Appellant.*

No. 03-10548

D.C. No.
CR-00-00229-MCE

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

HERBERT A. BATES,
        *Defendant-Appellant.*

No. 03-10604

D.C. No.
CR-00-00229-MCE

OPINION

Appeals from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted
May 9, 2005—San Francisco, California
Submission Vacated May 31, 2005
Resubmitted September 2, 2005

Filed September 13, 2005

Before: Andrew J. Kleinfeld, Michael Daly Hawkins, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Hawkins

13069

**COUNSEL**

John Balazs, Sacramento, California, for defendant-appellant Smith.

Victor S. Haltom, Sacramento, California, for defendant-appellant Bates.

Samantha S. Spangler, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

## OPINION

HAWKINS, Circuit Judge:

Defendants David Larry Smith ("Smith") and Herbert Arthur Bates ("Bates") appeal their convictions on multiple counts of tax fraud, mail and wire fraud, money laundering, and conspiracy, as well as their sentences. Defendants challenge: (1) arraignment by a magistrate judge, (2) multiplicity of the indictment resulting in a multiplicitous sentence on the three conspiracy counts, (3) an indictment passed on by grand jurors not questioned about their feeling towards the IRS, (4) denial of a suppression motion based on alleged defects in the arrest and search warrants, (5) sufficiency of the evidence on the tax counts, (6) denial of a motion for a new trial based on alleged petit juror bias, and (7) denial of a multiple conspiracy instruction. In addition to disputing the district court's application of various sentencing guidelines, Smith and Bates make a *United States v. Booker*, 125 S. Ct. 738 (2005), challenge to sentencing based on facts not found by a jury, and an *ex post facto* challenge to application of an advisory guideline system to their sentences. We have jurisdiction under 28 U.S.C. § 1291 and affirm the convictions in all respects and remand on sentencing pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

## FACTS AND PROCEDURAL HISTORY

The government brought Smith and Bates[1] to trial for

---

[1]Smith and Bates were tried as co-defendants with another alleged participant in the conspiracy, Charlotte Wadsworth. Wadsworth was acquitted by the jury.

enlisting hundreds of clients to set up trusts known as Unincorporated Business Organizations, or "UBOs," which purportedly avoided taxes on income streamed into them; the defendants charged their clients to set up and conduct transactions for the UBOs, only to later steal their clients' money.

The defendants advised their clients to transfer all of their income and assets — including their businesses, homes, relative's homes, furniture, jewelry, cars, and even pets — into the UBO. Defendants also advised clients to ask their employers to issue pay checks, commission checks, or other income sources in the names of their UBOs instead of in their names.

Moreover, the defendants assured clients that they could use the UBOs to pay a variety of expenses, to be deducted as "business expenses" from the UBO's income. These business expenses included everything from mortgage and utility payments to business equipment to haircuts, pet needs, laundry, clothes, and lawn care. As one client testified, "practically everything we did could be seen as a legitimate deduction." Another client echoed that "pretty much everything could be deducted or be used as legitimate business expenses. . . . Probably certain personal items were not exempt, so to speak. Like toothpaste."

Numerous clients testified at trial how defendants (usually Smith[2]) advised them that they did not have to pay taxes once they paid the defendants to establish a UBO. For example, Phyllis Ellen Denby testified that Bates advised her to establish a UBO to distribute stock profits in a way the IRS would not be aware of them. Bates told Denby and her husband that no taxes need be paid on "any money" that was in the UBO. Charles Michael Stoker testified that Smith told him and his wife that by placing their home into the UBO, the home could be sold and yet he could withhold the proceeds from tax fil-

---

[2]Bates told clients that he took care of dealings with the IRS and legal advice, while Smith provided investment advice.

ing. David Vette testified that Smith informed him that "as long as the UBO did not have a profit at the end of the year, there was no taxable consequence. I did not have to file a tax return." Ronald J. Herrema testified that Smith told him that UBOs are never audited and do not have any filing requirements. Smith strongly recommended that Herrema "get rid of any cash" in the UBO at the end of the year to "not raise a flag to the Internal Revenue Service," and thus "never [be] subject to filing requirements or IRS audit inspections." And, Smith "highly suggested" that he and his wife kept their income below $10,500, the ceiling below which married couples were not required to file tax returns.

Similarly, James Allen Herrema testified that Smith told him that the benefit of the UBO receiving his income is that he "would not have to file personal income tax on that income." Smith plainly stated that income into the UBO "fell into a category of not being taxable." When Herrema specifically asked whether he had to continue filing *personal* tax returns, Smith said "it was not necessary." Sharon Ludders testified that she was told that everything she owned could be transferred into the UBO, and that the trust would "take care" of her obligations to pay personal income taxes. Judith Reitz testified that Smith told her that "it wasn't necessary" for her UBO to file a tax return; "[i]n fact, it was really not desirable." When Ms. Reitz said she planned to continue filing personal income tax returns, Smith explicitly told her not to file.

Michael Joseph Young was told by Smith that trust expenses would be deducted from the income into the trust, to achieve a zero balance at the end of the year. "You didn't have to worry about filing a return or anything like that on it." Young understood from Smith that the money that went into the UBO did not need to be reflected on his personal income tax return, either. Lawrence Newton Craig testified that Smith said that UBOs did not have to file any tax returns. Smith said UBOs were "basically a tax shelter."

In addition to the above advice, Smith had a "particular way" at "particular bank[s]" to set up the UBO accounts, which he did in person. Smith established non-interest-bearing accounts for the UBOs, which the government argued kept the banks from filing with the IRS to report interest income.

Smith told clients not to discuss their UBOs with qualified accountants or attorneys. Bates told one set of clients to not even tell their closest relatives about their UBO. Smith told another client that she did not have the authority to provide UBO-related documents to the IRS because a vote of the trustees was needed. Bates and Smith also insisted on handling correspondence with the IRS. For example, Bates would write the IRS requesting legal authority for reporting certain income to the IRS, as well as asking the IRS to review certain portions of the Constitution regarding the power to collect taxes. The letters attempted to avoid paying taxes. Indeed, with or without such letters, most of the defendants' clients did not file tax returns and/or filed tax returns that omitted substantial income.

In order to make the UBO scheme work, many clients were told that they had to make "distributions" out of their UBOs to avoid filing taxable income within them. As one client put it, "if there was a [UBO] profit, we would do a distribution, and that would eliminate any of the profit, and there would be no taxable occurrence." Clients were told that their "distribution" was "going offshore into an investment program . . . and it would earn a profit . . . and [they] would have access to it down the road." Smith offered several ways to get the distribution money back, including an out-of-country credit card account or a direct payment to Smith to move the money offshore for an eleven percent charge. Although clients could access their distribution or investment money for a while, Smith eventually transferred the money to another bank, and the clients could no longer access their money. Client losses ranged from $20,000 to $400,000.

Agent Bridgette O'Keeffe ("Agent O'Keeffe"), the government's summary witness, testified, among other things, regarding (1) each of the tax returns charged in the counts pertaining to aiding and assisting false or fraudulent returns, and (2) the numerous mail fraud and wire fraud counts, explaining the monies she traced that clients had invested with the defendants that ended up in Cayman Islands accounts.

The jury found Bates guilty of: (1) conspiracy to defraud the United States in the ascertainment, computation, or assessment of taxes, in violation of 18 U.S.C. § 371; (2) multiple counts of aiding and assisting in the preparation and presentation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2); (3) conspiracy to engage in mail or wire fraud, in violation of 18 U.S.C. § 371; and (4) conspiracy to launder money, in violation of 18 U.S.C. § 371. The jury also found Smith guilty of the above charges, as well as multiple counts of each of the following: (1) mail fraud, in violation of 18 U.S.C. § 1341; (2) wire fraud, in violation of 18 U.S.C. § 1343; (3) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A) 1956(a)(1)(B); and (4) engaging in financial proceeds of unlawful activity, in violation of 18 U.S.C. § 1957.

Bates and Smith moved for a new trial based on the alleged lack of impartiality of Jurors #9 and #1. Juror #9 wrote Agent O'Keeffe after the trial suggesting they "get acquainted." Juror #9 did not converse with Agent O'Keeffe during the trial, at most exchanging a smile across elevators. The district court considered allegations of Juror #9's bias, and found "absolutely no tangible evidence that there was any extraneous information or extraneous influence on this juror by anyone."

During deliberations, Juror #1 wrote that she was criticized by the foreperson and felt intimidated. The district court questioned Juror #1 outside the presence of other jurors, whereupon Juror #1 told the court she felt able to return to

deliberations and make future decisions based on her own conscience and belief. After considering the evidence as to Jurors #1 and #9, the district court denied the motion for a new trial.

At the close of the evidence, Smith moved for judgment of acquittal on the counts charging him with aiding and assisting in the preparation and presentation of false tax returns and conspiracy to commit tax fraud. The district court denied the motion as to both Smith and Bates, and denied the renewed motion after the verdict as to all defendants.

Smith was sentenced to 151 months' imprisonment; Bates to 136 months' imprisonment. The district court also ordered three defendants, including Smith and Bates, to forfeit $1 million, pursuant to the parties' stipulation.

## DISCUSSION

### I.   *Magistrate Judge's Authority to Conduct Arraignment*

Magistrate Judge John F. Moulds presided over Smith's hearing for the entry of a plea. The magistrate judge asked Smith's counsel, Scott Tedmon, for the entry of the plea to the indictment. Smith's counsel had no objection and stated that his client was prepared to enter a plea of not guilty and requested a jury trial. The magistrate judge then scheduled a status conference before District Judge Lawrence Karlton.

Smith now argues that the magistrate judge had no authority to arraign Smith under Rules 5 and 10 of Criminal Procedure, and that Judge Karlton erroneously denied his motion to dismiss the indictment on this ground. We review de novo the district court's refusal to dismiss an indictment for lack of jurisdiction. *United States v. Phillips*, 367 F.3d 846, 854 (9th Cir.), *cert. denied*, 125 S. Ct. 479 (2004).

Rule 5 pertains to initial appearances before a magistrate judge for "arrest[s] under a warrant issued upon a complaint

or any person making an arrest without a warrant." Fed. R. Crim. P. 5(a) (2000). Thus, Rule 5(c)'s provision that a magistrate judge may not accept a plea in a felony case is inapposite.

Nor does Smith cite any violations of Rule 10 (stating the requirements for an arraignment in open court) either, except to say that magistrate judges are not authorized to conduct a Rule 10 arraignment. Smith is mistaken. Rule 72-302(b)(1) of the Local Rules of the United States District Court for the Eastern District of California grants authority to magistrate judges to handle pretrial matters in felony cases, and does not exclude the arraignment process for a not guilty plea. Thus, the magistrate judge had authority to arraign Smith.

## II. *Multiplicity of Conspiracy Counts & Plain Error*

The three conspiracy counts are: (1) conspiracy to defraud the United States in the ascertainment, computation, or assessment of taxes, in violation of 18 U.S.C. § 371; (2) conspiracy to engage in mail or wire fraud, in violation of 18 U.S.C. § 371; and (3) conspiracy to launder money, in violation of 18 U.S.C. §§ 371 and 1956(h). Bates and Smith[3] argue that these three conspiracy counts are multiplicitous because there was only one combined scheme, i.e., one conspiracy. Bates asserts that the convictions and consecutive sentences on these counts violate the Double Jeopardy Clause and separation of powers principles. Bates bases these claims not on the multiplicity of the indictment, but rather the multiplicity of sentences imposed by the district court.

Typically, whether a defendant's double jeopardy rights have been violated is reviewed de novo. *United States v. Stoddard*, 111 F.3d 1450, 1454 (9th Cir. 1997). However, Bates

---

[3]It appears from the joint reply brief that Smith joins Bates in this argument. ("[A]ppellants' consecutive sentences on the three conspiracy counts in this case are multiplicitous and constitutionally infirm.")

did not clearly raise the multiplicity of sentences issue below. Though Bates claims that he raised the issue when his counsel argued at the sentencing hearing that "the Government's case against [Bates] was one set of acts done for a common purpose, and that he, therefore, should be sentenced accordingly rather than for multiple reasons," this one sentence is insufficient to raise a double jeopardy objection with respect to the three conspiracy counts.

Nevertheless, a multiplicious sentence cannot be waived.[4] *See Launius v. United States*, 575 F.2d 770, 772 (9th Cir. 1978) (per curiam) ("[I]f sentences are imposed on each count of [a] multiplicious indictment the defendant is not forced to serve the erroneous sentence because of any waiver.") (internal quotations and citation omitted). Because Bates failed to raise this issue before the district court, plain error review applies. *See United States v. Freeman*, 6 F.3d 586, 600-01 (9th Cir. 1993) (consecutive sentences for duplicitous charges subject to plain error review); *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1028-29 (9th Cir. 2000) (failure to raise double jeopardy claim based on a second trial not waived absent evidence of a voluntary and knowing relinquishment of right against double jeopardy).

For Bates to prevail under plain error review, he must show (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 467 (1997).

**[1]** "The Double Jeopardy Clause prohibits subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute." *United States v. Montgomery*, 150 F.3d 983, 989 (9th Cir. 1998) (internal quotations and citation

---

[4]Multiplicity of sentences is unlike the issue of the multiplicity of an indictment, which can be waived if not raised below. *United States v. Klinger*, 128 F.3d 705, 708 (9th Cir. 1997).

omitted). Because all three conspiracy counts in this case violate the same statute—18 U.S.C. § 371**⁵** —this court uses the five-factor test adopted in *Arnold v. United States*, 336 F.2d 347, 350 (9th Cir. 1964), rather than the test articulated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See United States v. Luong*, 393 F.3d 913, 916 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 1953 *and* 1963 (2005); *Montgomery*, 150 F.3d at 990.

**[2]** The *Arnold* analysis has been summarized by *Stoddard*:

> To determine whether two conspiracy counts charge the same offense and so place the defendant in double jeopardy, we consider five factors: (1) the differences in the periods of time covered by the alleged conspiracies; (2) the places where the conspiracies were alleged to occur; (3) the persons charged as coconspirators; (4) the overt acts alleged to have been committed; and (5) the statutes alleged to have been violated.

111 F.3d at 1454 (internal quotations and citation omitted). Rather than focus on any one factor, the court considers all the factors together to determine if there was more than one agreement. " 'The fact that there is some interrelationship between conspiracies does not necessarily make them the same criminal enterprise,' where one conspiracy involves unlawful transactions 'quite distinct in their means of execution and their objects.' " *United States v. Guzman*, 852 F.2d 1117, 1121 (9th Cir. 1988) (quoting *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir. 1976) (per curiam).

---

**⁵**Title 18 U.S.C. § 371 states, in part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

On appeal, the defendant has the burden of showing that the multiple conspiracies charged are based on a single agreement, i.e., that the conspiracies are "indistinguishable in law and in fact." *Montgomery*, 150 F.3d at 990 (citing *Guzman*, 852 F.2d at 1119-20). This issue is based on sufficiency of the evidence, examining the evidence "in the light most favorable to the prosecution to determine if any rational trier of fact could have found that more than one conspiracy existed." *Id.*

A. *Time Frame*

**[3]** The government alleged that the Count 1 conspiracy spanned from August 14, 1981 to June 13, 1997, the Count 25 conspiracy from August 14, 1981 to February 1, 1998, and the Count 64 conspiracy from January 1, 1987 to June 13, 1997. Thus, there is substantial overlap in timing. It is worth noting here that the government argued that "from the very beginning" of the Count 1 agreement, there was a plan to steal the clients' money, which would involve mail and wire fraud (Count 25) and money laundering (Count 64). ("From the very beginning of the agreement between the parties, the agreement was to engage in tax crimes together with mail and wire fraud crimes together with money laundering crimes.")

B. *Geographic Locations*

**[4]** Bates contends that the vast majority of activities relevant to all three counts occurred in Sacramento, California, and the Cayman Islands. The government does not dispute this contention. The indictment and the evidence at trial support Bates's contention that the overt acts for all three counts occurred in the same geographic locations.

C. *Participants*

All four defendants were charged in Count 1, and all defendants except Charlotte Wadsworth were charged in Counts 25 and 64. However, the third factor depends not only on overlap

in membership, but also the roles of the overlapping members. *Stoddard*, 111 F.3d at 1455. Bates contends that the roles were the same in all three counts.

**[5]** The government argued at trial that the defendants each played different roles in the various schemes. However, that many overt acts are incorporated by reference between the conspiracy counts supports the defendants' argument that the (different) role of each defendant was similar across the three alleged conspiracies.

### D.  *Overt Acts*

**[6]** Although the overt acts for three counts are not identical, they substantially overlap. For Count 1, the government alleged 166 overt acts; for Count 25, 151 of the 166 overt acts are incorporated by reference, and 23 new overt acts are added; for Count 64, overt acts are incorporated by reference from Counts 1 and 25.

The overt acts in Count 1 generally relate to defendants: (1) forming various UBOs, (2) accepting fees (in the form of checks or wire transfers) for the UBOs, (3) depositing fees, (4) serving as agents or trustees for the UBOs, (5) advising clients they need not file taxes, (6) writing letters to clients and the IRS, (7) forming corporations and bank accounts in the Cayman Islands, (8) opening bank accounts in California, and (9) authorizing wire transfers between various accounts. Count 25 adds overt acts pertaining to specific fraudulent investments defendants persuaded the UBO clients to pursue.

### E.  *Statutes Violated*

**[7]** The three conspiracy counts allege a violation of the same statute — 18 U.S.C. § 371 — although Count 64 also alleges a violation of 18 U.S.C. § 1956(h). However, the fifth factor considers not only the violation of the same statute, but

also whether the goals of the conspiracies were similar. *Stoddard*, 111 F.3d at 1456.

The government specifically addressed in closing argument how 18 U.S.C. § 371 can relate to three separate crimes. In arguing that "the conspiracy counts are very different," the government first pointed to the two distinct types of crimes covered by § 371: (1) conspiracy to defraud the United States in the exercise of its lawful governmental functions, and (2) conspiracy to violate a specific section of the United States Code. The government further explained that Count 1, the first type of conspiracy, related to defrauding the IRS in the assessment of taxes, whereas Counts 25 and 64 related to violations of different code sections (mail or wire fraud sections, and money laundering sections, respectively).

However, the government argued to the jury that the goals of defrauding the government, and engaging in mail and wire fraud and money laundering, were all inter-related:

> This case is a situation where the defendants had a single unified plan from the very beginning. This is not a situation where the defendants that engaged in one type of activity and then did that for a while and then decided to get into some other type of activity which might be fraudulent and then to launder money at the end of day.

> The defendants had a single, unified plan from, as I say, the very get-go in this case. From the very beginning of the agreement between the parties, the agreement was to engage in tax crimes together with mail and wire fraud crimes together with money laundering crimes. That's the only way the defendants' actions and their activities make any sense at all is to look at all the actions as pieces of a bigger essentially three-dimension, circular-type of a scheme.

The tax scheme was set up in a certain way specifically for the purpose to create the ability to engage in mail and wire fraud. . . . And the defendants could not engage in mail and wire fraud if they did not launder money. . . . So from the very beginning, the defendants had it in their mind the aspect of stealing — effectively stealing, to use a generic term, money from the investors and use the promotion of the tax vehicle as a way to accomplish that fraud.

The government concluded closing arguments with the point that all the counts were fraud crimes to enrich the defendants — with respect to the tax crimes, to collect fees on the UBOs; with respect to money laundering, "to move the money around and get what [defendants] need without being caught"; and with respect to mail and wire fraud, more monetary motives.

**[8]** Given the government's contention that the goal for all three conspiracies was one and the same — to steal money — it appears under *Stoddard* that they should be treated as one conspiracy, at least for the purpose of sentencing. Considering all five *Arnold* factors, it was arguably error for Bates and Smith to be sentenced to consecutive terms on the three conspiracy counts.

**[9]** However, an error is not plain unless it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993). Plain error "is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection." *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997) (citing *United States v. Frady*, 456 U.S. 152, 163 (1982)). In this complex case, with hundreds of overt acts, multiple defendants, and weeks of trial, it was not plain or obvious that only one conspiracy transpired. Indeed, the government convinced the jury that the defendants engaged in three separate conspiracies.

**[10]** To muddle the multiplicity issue further, defendants did not merely fail to argue that there was one overarching conspiracy for double jeopardy purposes; they argued the opposite position: that each of the three conspiracy counts were themselves duplicitous, encompassing multiple agreements and conspiracies in each one. That is, they asserted that there were *even more* conspiracies. As to Count 1, Smith disputed one overarching conspiracy to defraud the United States because the overt acts covered six alleged UBOs, with differing (1) time periods, (2) identity of defendants involved, (3) identity of taxpayers involved, and (4) specific transactional facts. Smith posed the "same argument and analysis" from Count 1 to Counts 25 and 64. Thus, it was not clear or obvious that the three conspiracies were multiplicitous, even at the sentencing stage. The defendants have failed to show plain error.

### III.   *Dismissal of Indictment Based on Potentially Biased Grand Jury*

Smith argues that the district court erred in denying his motion to dismiss the indictment because the grand jurors were not questioned about their contacts with the IRS to ensure that they could serve as impartial jurors.

We review de novo the district court's denial of a motion to dismiss an indictment. *United States v. Rivera-Sillas*, 376 F.3d 887, 889 (9th Cir. 2004). A district court may not dismiss an indictment for error in a grand jury proceeding unless the error prejudiced the defendant. *Bank of N.S. v. United States*, 487 U.S. 250, 254 (1988). "Substantial proof of grand jury bias is required to overturn an indictment." *United States v. Miller*, 105 F.3d 552, 555 (9th Cir. 1997).

**[11]** Smith bases his grand juror (potential) bias claim on 28 U.S.C. § 1866(c)(2), which states in part that "no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: *Provided*, That any person

summoned for jury service may be . . . (2) excluded by the court on the ground that such person may be unable to render impartial jury service." Not surprisingly, neither § 1866(c)(2) nor any Ninth Circuit case[6] requires probing the grand jurors with questions about their feelings toward the IRS.

[12] Given that Smith makes no factual allegation of actual bias on the part of any grand juror in his case, he has not shown "[s]ubstantial proof of grand jury bias," *see Miller*, 105 F.3d at 555, let alone prejudice, *see Bank of N.S.*, 487 U.S. at 254. Thus, the district court did not err in denying dismissal of the indictment on this ground.

## IV.   *Search and Arrest Warrants*

Smith argues that the district court erred by denying his motion to suppress evidence based on defects in the search and arrest warrants, alleging that: (1) the search warrant lacked particularity and was facially overbroad, (2) the government agents flagrantly seized items outside the scope of the warrant, (3) the agents failed to provide a complete copy of the warrant at the outset of the search, and (4) the search and arrest warrants were invalid because they lacked a court seal and the magistrate judge did not sign the arrest warrant.

---

[6]Smith mischaracterizes *United States v. Hashimoto*, 878 F.2d 1126, 1134 n.9 (9th Cir. 1989), as determining that "general questions that did not delve into a juror's attitudes and dealings with the IRS are inadequate to expose bias of petit jurors in criminal tax cases." In *Hashimoto*, the trial court refused defendant's request for a jury panel list to investigate whether the jurors had been audited by the IRS, as he was entitled to do under 26 U.S.C. § 6103(h)(5). 878 F.2d at 1129-33. Because of the specificity of the § 6103(h)(5) inquiry, general questions on juror impartiality did not overcome the presumption of prejudice from the denial of the list. *Id.* at 1134 n.9. However, the court found that the presumption of prejudice could be overcome by juror voire dire on past audits and attitudes toward the IRS. *Id.* at 1134. *Hashimoto* does not hold that grand jurors in tax cases must be asked such questions.

We review de novo the district court's denial of a motion to suppress, and the factual findings supporting the denial for clear error. *United States v. Mann*, 389 F.3d 869, 874 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 1719 (2005).

## A.   *Particularity and Overbreadth*

**[13]** "The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). As *Spilotro* explained, "[t]he description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *Id.* The purpose of the breadth requirement is to limit the scope of the warrant "by the probable cause on which the warrant is based." *In re Grand Jury Subpoenas*, 926 F.2d 847, 856-57 (9th Cir. 1991). Both the particularity and breadth requirements prevent "general, exploratory rummaging in a person's belongings." *Id.* at 857 (quotation marks and citations omitted).

Smith argues the warrant in this case "failed to restrict government agents in any meaningful way, converting the warrant into the type of general, overbroad warrant prohibited by the Fourth Amendment." Specifically, Smith argues that paragraphs 1 through 11 of the search warrant's Attachment B "authorized the seizure of virtually all of Smith's personal and business records, electronic documents, photographs, films, and videotapes . . . 'for the period of January 1990 through the current date.' "

Attachment B describes the items to be seized as follows:

> For the period January 1990 through the current date:
>
> 1) The following documents relating to the promotion of UBOs: seminar tapes, presentation docu-

ments, video tapes, literature, flyers, advertising, and business cards.

2) UBO client files to include UBO names, individuals names, addresses, telephone numbers, and other identifying information; contracts of "UBO Organization"; copies of minutes; domestic and foreign bank account statements; wire transfer documents; canceled checks; deposit slips; copies of money orders; copies of cashier's checks; correspondence to, from, and on behalf of UBO clients including correspondence with the IRS; copies of Forms SS-4, Request for Employer Identification Number; records of payments from and to UBO clients reflecting dates and purpose of such payments; invoices; receipts; memoranda; copies of tax returns, and any documents used in the preparation of tax returns.

3) All documents relating to any alleged defense contractor loan investment program including literature, contracts, agreements, notes, financial statements and records, correspondence, memoranda, receipts, advertising, and other records; copies of letters and invoices or monthly statements to investors.

4) All documents pertaining to the purchase, and/or sale, and/or transfer of real property including escrow statements, deeds, deeds of trust, mortgages, notes, correspondence, closing statements, mortgage payments and down payments including documents reflecting the form, amount, and date of such payments. Documents pertaining to the purchase/sale of personal property including vehicles, furniture, and other items to include receipts, contracts, agreements, financial statements, purchase agreements, and correspondence.

5) All books and records of UBO businesses, including general journals, general ledgers, financial statements, balance sheets, income statements, cash receipts and disbursements journals[.]

6) All documents relating to the receipt and disbursement of income, by or from any UBO, including credit card receipts and statements, receipts, invoices, statements of accounts at domestic and foreign banks, check registers, cancelled check, money orders, cashier's checks, wire transfer documents, bank drafts, safety deposit box records, stocks, bonds, and other securities, investment records, loan applications, and other financial statements, promissory notes, telephone toll records and bills, personal calendars, address and telephone books, rolodex indices, records relating to domestic and international travel including tickets, reservations, hotel receipts, travel logs, itineraries, and receipts, Forms 1099 and other tax documents; any other records used to reconstruct income and expenses; records relating to safe deposit box rental.

7) All documents reflecting current ownership, occupancy, and use of premises including utility bills, receipts, correspondence, monthly statements, photographs, film, and video tapes.

8) All information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment. This media includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, laser disks, video cassettes, and any other media which is capable of storing magnetic coding.

9) All electronic devices which are capable of analyzing, creating, displaying, converting, or transmit-

ting electronic or magnetic computer impulses or data. These devices include, but are not limited to, computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

10) All instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized include, but are not limited to, operating systems, application software, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

11) All written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device which is present at the scene.

**[14]** The warrant's Attachment B describes with sufficient specificity the types of documents and property sought. Potentially problematic is its breadth: though limited in time period and subject matter (UBO businesses and loan investment program since 1990), the warrant is quite broad as it relates to those enterprises. However, even an "extraordinarily broad" warrant authorizing the seizure of essentially all business records may be justified when there is "probable cause to believe that fraud permeated the entire business operation." *United States v. Offices Known as 50 State Distrib. Co.*, 708 F.2d 1371, 1374 (9th Cir. 1983). This is just such a case. The magistrate judge reviewed Agent O'Keeffe's affidavit in support of the application for the search warrant, which detailed her comprehensive investigation of the UBO scheme. The

affidavit concluded that "the entirety of the businesses operated by Bates, Smith and their associates are criminal in nature." Agent O'Keeffe's affidavit provided ample probable cause to meet the "permeated-with-fraud" exception to the particularity and breadth requirements.

### B.  *Seizure Outside the Scope of Warrant*

Smith claims that federal agents flagrantly seized innocuous personal items outside the scope of the warrant, such as Christmas gifts, computer monitors, and computer games. However, computer monitors and computer games (to the extent they were on computer diskettes) were within the scope of the warrant. The alleged Christmas gifts remain unidentified in the record. Thus, there is no evidence that there was any evidence seized outside the scope of the warrant.

### C.  *Defects in Providing Warrant to the Smiths*

The district court held that the warrant "was provided to the Smiths on a prompt basis." The district court further held that, although Agent O'Keeffe's affidavit was not attached to the warrant, the warrant was valid and served the purpose of providing notice to the Smiths that the officers were executing a search under the color of law. Smith argues that the search of his home violated Federal Rule of Criminal Procedure 41(d) (1997)[7] because (1) agents failed to provide a copy of the search warrant at the outset of the search, and (2) the warrant was incomplete without the affidavit that was incorporated by reference into the warrant.

---

[7]Rule 41(d) stated, in relevant part: "The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken."

1. *Failure to Provide Search Warrant at Outset of Search*

At the evidentiary hearing, there was some discrepancy as to the length of time after the search began before Smith and his wife received a copy of the warrant. It is clear that the search did not start as soon as the agents entered the home, as they initially conducted a safety sweep for approximately fifteen minutes. The district court established that a delay of thirty to forty-five minutes occurred before the Smiths received the warrant.

**[15]** Under *United States v. Gantt*, 194 F.3d 987, 1001 (9th Cir. 1999), "[a]bsent exigent circumstances, Rule 41(d) requires service of the warrant at the outset of the search on persons present at the search of their premises." While the court recognized that " 'technical' violations of Rule 41(d) require suppression only if there was a 'deliberate disregard of the rule' or if the defendant was prejudiced," it held that suppression was justified due to the deliberate violation in Gantt's case. *Id*. at 1005. Gantt was not served with the search warrant until after she was arrested, hours after the search and hours after she requested to see the warrant. *Id*. at 1000.

**[16]** In Smith's case, there is neither deliberate disregard of Rule 41(d) nor any prejudice. *Gantt*'s interpretation of Rule 41(d) to require service of the warrant at the outset of the search was issued in 1999, whereas the search of Smith's home took place in 1997. Agent Adams's testimony reveals he did not know of an obligation to show the warrant at the outset of the search — Adams "never" before had presented a warrant at the time of entry. Instead, his team typically did a safety sweep first, as was done in the Smith home.

Furthermore, unlike in *Gantt*, after Mrs. Smith asked for the warrant, she got one. The timing may be disputed — ten minutes after the request or half an hour later — but regardless, she and her husband received the warrant near the outset

of the search. As the district court found, the delay was not unreasonable.

**[17]** Nor was the delay prejudicial. Upon receiving the warrant, Mrs. Smith "just kind of glanced at it" and believes that her husband "might have looked at it" more than she did. She admits that she chose not to review the warrant. Neither of the Smiths disputed the warrant after having access to it, and the search went on for another several hours. Thus, under *Gantt*, there was only a technical violation of Rule 41(d), which does not require suppression.

### 2. *Warrant Missing Affidavit*

**[18]** That the Smiths were given the search warrant without the affidavit of Agent O'Keeffe, though incorporated by reference in the warrant, does not require suppression. Smith argues that *Gantt* held that "when a warrant incorporates by reference the supporting affidavit, the affidavit comprises part of the warrant itself and must be provided with the rest of the warrant. 194 F.3d 987, 1001 n.7." The cited footnote 7 states: "Showing Gantt the face of the warrant without Attachment A certainly did not satisfy Rule 41(d). Without Attachment A, the warrant violated the Fourth Amendment's particularity requirement and for purposes of Rule 41(d) was not a valid warrant."

What Smith leaves out is the content of Attachment A in Gantt's case, which is substantively different from the O'Keeffe affidavit. In *Gantt*, "[i]nstead of describing the items to be seized, the warrant stated 'see Attachment A.' Attachment A was a two-page, typed list of items to be seized." *Id*. at 996. In Smith's warrant, Attachment B, which described the items to be seized, was attached. It was Agent O'Keeffe's affidavit, admittedly important in the magistrate judge's probable cause determination, that was missing. Agent O'Keeffe's affidavit was not related to the particularity requirement, which was satisfied by Attachment B.

Smith confuses the "well-settled principle that a warrant's overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized," *United States v. Luk*, 859 F.2d 667, 676 (9th Cir. 1988), with the contention, unsupported by case law, that an affidavit incorporated by reference must always be attached for the search warrant to be valid — even if the warrant is not overbroad without the attachment. For example, in *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986), the court held that the affidavit could not be considered because it did not accompany the warrant; nevertheless, the court went on to examine the warrant "on its face" for overbreadth, determining it met the breadth requirement and did not require suppression, *id*. at 1355-56.

**[19]** Thus, here, the warrant without the affidavit was facially valid standing alone. The failure to attach the affidavit does not require suppression.

### D. *No Court Seal on Search and Arrest Warrants; No Magistrate Judge's Signature on Arrest Warrant*

Smith argues that the search and arrest warrants are void because (1) the arrest warrant was initialed only by the court clerk, but not signed by the magistrate, in violation of Rule 4(c)(1) of Criminal Procedure, and (2) neither warrant contained the seal of the court. The district court found that neither alleged defect invalidated the warrants.

First, Rule 9, rather than Rule 4(c)(1), governs arrest warrants on an indictment. Rule 9(b)(1), pertaining to the form of the warrant, states it must be signed "by the clerk," not the magistrate judge.

Smith's second argument that the court seal must be affixed to both the search and arrest warrants also fails. The argument relies on 28 U.S.C. § 1691, which states: "All writs and process issuing from a court of the United States shall be under

the seal of the court and signed by the clerk thereof." However, the Federal Rules of Criminal Procedure for arrest warrants on an indictment (Rule 9) and search warrants (Rule 41) make no mention of the requirement for a court seal. The arrest warrant and search warrant follow the stated dictates of Rules 9 and 41, respectively. The magistrate judge unquestionably issued a bench warrant without bail on Smith, and a deputy clerk signed an arrest warrant, as required by Rule 9. The search warrant was issued and signed by a magistrate judge on January 3, 1997.

[20] Thus, there appears to be only a technical violation of 28 U.S.C. § 1691. None of this circuit's cases has suppressed evidence for lack of a court seal. *Cf. Ystrom v. Handel*, 252 Cal. Rptr. 110, 114 (Ct. App. 1988) (lack of court's seal "is a mere technicality and does not render [a summons] 'substantially defective' ").

[21] We have refused to suppress evidence or reverse convictions based on technical rule violations. In a similar context, " 'technical' violations of Rule 41(d) require suppression only if there was a 'deliberate disregard of the rule' or if the defendant was prejudiced." *Gantt*, 194 F.3d at 1005. Here, there is no evidence in the record that officers executing either warrant relied in bad faith on them because they lacked the court seal, and certainly no evidence of deliberate disregard of 28 U.S.C. § 1691. Neither is there a scintilla of prejudice to the defendant: if the warrants did have the court seal, Smith's home would still have been searched, and his person still arrested. Thus, neither suppression nor reversal of Smith's conviction is warranted by this technical violation of 28 U.S.C. § 1691.

## V.   *Sufficiency of the Evidence*

Smith and Bates argue that the evidence is insufficient to sustain their convictions for: (1) multiple counts of aiding and assisting in the preparation and presentation of false tax

returns, under 26 U.S.C. § 7206(2); and (2) conspiracy to defraud the United States in the ascertainment, computation, or assessment of taxes, under 18 U.S.C. § 371.

After the jury verdict, the district judge denied a Federal Rules of Criminal Procedure 29 motion for judgment of acquittal as to all defendants. We review de novo the district court's ruling on a motion for acquittal. *United States v. Johnson*, 357 F.3d 980, 983 (9th Cir. 2004). The evidence is reviewed in the light most favorable to the prosecution to determine "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotations and citations omitted).

Section 7206(2) pertains to any person who:

> Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document[.]

**[22]** Under § 7206(2), the government must prove that "(1) the defendant aided, assisted, or otherwise caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful." *United States v. Salerno*, 902 F.2d 1429, 1432 (9th Cir. 1990). Defendants argue that the government presented insufficient evidence on all three elements.

A. *Aid, Assist In, Procure, Counsel, or Advise*

**[23]** Although Smith and Bates did not actually prepare their clients' tax returns, the plain language of § 7206(2) is

satisfied by aid, assistance, procurement, counsel, or advice in the preparation or presentation of a false or fraudulent return — there need not be actual preparation of the return at issue. Unsurprisingly, we do not require defendants engaged in tax schemes to physically "prepare" the tax returns to be found guilty of § 7206(2). *See, e.g.*, *United States v. Crum*, 529 F.2d 1380, 1382 (9th Cir. 1976) ( "[T]he reach of Section 7206(2) is clearly not limited to acts of tax return 'preparers[.]' ").

**[24]** A review of the record reveals ample evidence of aid, assistance and advice in the preparation of the defendants' clients' false tax returns. To promote their tax shelter scheme, the defendants explicitly advised their clients to transfer all of their income and assets to the UBO, and then not to file any tax returns (for the business trust, personal income, or otherwise). Smith advised UBO clients to have their employers issue pay checks, commission checks, or other income sources in the name of the UBO instead of the clients' names. Further, defendants established mechanisms for the UBO income to go undetected by the IRS, such as keeping end-of-the-year income below a certain threshold through "distributions," false "business deductions," and non-interest-bearing accounts. These actions directly caused clients to file false and fraudulent returns.[8]

---

[8]Defendants mistakenly argue that this case is "indistinguishable" from *United States v. Dahlstrom*, 713 F.2d 1423, 1429 (9th Cir. 1983), which held that "[p]rosecution for advocacy of a tax shelter program in the absence of any evidence of a specific intent to violate the law is offensive to the first and fifth amendments of the United States Constitution." *Dahlstrom*'s holding is limited to pure advocacy or speech cases. *See United States v. Schulman*, 817 F.2d 1355, 1359 (9th Cir. 1987) (*Dahlstrom* is properly read as an advocacy case); *United States v. Russell*, 804 F.2d 571, 576 (9th Cir. 1986) (Ferguson, J., concurring) (as a member of the *Dahlstrom* panel, describing the case as "primarily a First Amendment case involving pure advocacy").

## B. *Fraudulent or False Return*

Smith argues that the particular 1040 personal returns or 1065 partnership tax returns were not false for omitting income or revenue that should have been reported on a separate 1041 trust return. However, IRS Agent Brown testified that although revenue in a business trust such as a UBO would typically be reported on a form 1041, as a default the income could also be reported on a 1040 personal income tax return. In any event, the income had to be reported on some IRS form. Thus, the under-reporting of income on the clients' personal returns, that could have been but was not reported elsewhere, made the personal returns "false" or "fraudulent."

**[25]** Agent O'Keeffe methodically went through each allegedly false or fraudulent return, and testified to the substantial understatement of income on each one. Viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence from which a rational juror could find that the returns were false or fraudulent.

## C. *Willfulness*

Smith argues that the evidence was insufficient to show that he acted willfully "with specific intent to defraud the government in the enforcement of its tax laws." *Salerno*, 902 F.2d at 1432. While there is nothing "inherently unlawful with an UBO," and the government told the jury during closing argument to assume UBOs are "legitimate," the government provided ample evidence that Smith gave advice to *unlawfully* use UBOs to file false or fraudulent tax returns (or not to file at all).

Smith further argues that there was no evidence presented that Smith was advised by the IRS that UBOs must file a tax return or that his actions were illegal. However, Smith worked in concert with Bates, who kept busy drafting "response" let-

ters to the IRS disputing the IRS's contention that taxes needed to be paid.

Finally, Smith argues that "even under the government's own theory, Smith's purpose was to steal money or defraud the persons who purchased UBOs from him; he did not have the specific intent to defraud the government in the enforcement of its tax laws." Smith ignores that stealing from clients and defrauding the government are not mutually exclusive — and that the evidence is sufficient to establish both purposes.

Smith argues that this case is analogous to *Salerno*, where this court reversed the defendants' § 7206(2) convictions because, although they were guilty for implementing a scheme to embezzle millions from the casino, "the government failed to prove the scheme had as a purpose the violation of the federal tax laws." 902 F.2d at 1430. The government had to show that the defendants engaged in the scheme "not merely for their own benefit but with a specific intent to cause the casino to file false tax returns." *Id.* at 1432. However, there was neither evidence that the defendants had anything to do with preparation of tax returns, nor "evidence that the defendants had any motive for conducting a scheme to defraud the government, [n]or that they ever mentioned their own taxes, much less the tax returns of the casino." *Id*.

Unlike in *Salerno*, Smith and Bates had as "a purpose," although not their sole purpose, the violation of tax laws. They specifically advised clients that the UBO income need not be reported on any kind of tax return, and told them not to consult friends, family, or accountants about their UBOs. The evidence was sufficient to prove that the defendants had a "specific intent to cause" their clients to file false returns.

**[26]** Further unlike *Salerno*, Smith and Bates had a "motive" for conducting a scheme to defraud the government: to hook the clients into giving them control over the clients' money so they could steal it. Finally, unlike in *Salerno*, here

there was ample mention of the clients' tax returns within the scheme. Thus, there was sufficient evidence, viewing the evidence in the light most favorable to the prosecution, to find that the defendants willfully intended to cause false or fraudulent returns to be filed.

### D. *Conspiracy Count 1*

Smith argues that the reasons for the insufficiency of the § 7206(2) counts apply to invalidate the Count 1 conspiracy conviction. Because his arguments with respect to the § 7206(2) counts fail, they fail equally with respect to the conspiracy count.

## VI. *Alleged Juror Bias & Misconduct*

Smith and Bates argue that they are entitled to a new trial because of two instances of alleged juror misconduct and bias. We review a district court's denial of a post-verdict evidentiary hearing for an abuse of discretion, *United States v. Saya*, 247 F.3d 929, 934 (9th Cir. 2001), and its denial of a new trial on the assertion of juror misconduct or bias for abuse of discretion as well, *United States v. Hanley*, 190 F.3d 1017, 1031 (9th Cir. 1999). "Because of the trial judge's unique opportunity to observe the jurors during trial, to hear the defenses asserted, and to hear the evidence, the judge's conclusion about the effect of the alleged misconduct deserves substantial weight." *Saya*, 247 F.3d at 937 (quotations and citations omitted).

### A. *Juror #9's Alleged Bias*

[27] "The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). "A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances." *Id.* at 974. However, "[a]n evidentiary hearing is not man-

dated *every* time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Hanley*, 190 F.3d at 1031 (quotations and citation omitted). An evidentiary hearing is not necessary where the court knows "the exact scope and nature" of the bias allegation. *Saya*, 247 F.3d at 935 (internal quotations and citations omitted).

About a month after the jury returned the verdicts in this case, Juror #9 wrote the following letter to Agent O'Keeffe:

Dear Bridget,

My name is Brandt Mayer and I was juror #9 in the Bates/Smith/Wadsworth trial in Sacramento recently. As a sworn in juror as you know, we were not allowed to converse with anyone on the case.

Now that it's over and forgotten by me (thank god) I would like the opportunity to be able to talk with you. Not about the case of course, or your profession or mine, but in a casual way.

I was deprived not being allowed to just walk up and start a conversation with you, which normally for me is completilly [sic] out of character, as I am a bit timid.

After listening to you on the stand [you] showed a very "kind" aura about you. You're [sic] sofistication [sic] also impressed me. You're [sic] introduction led me to believe that you are a single woman and has given me the comfort and insentive [sic] to write you.

I am hoping that you remember who I was: You were getting off the elevator one day on the 10th

floor and I leaned out of the elevator accross [sic] from you as we (the jurors) were heading down. I purposly [sic] gave you a smile. It appeared that you returned a smile back to me. In fact the jurors teased me about that for days afterward, but that's ok, I told them that the smile was for me and not them.

Could it be possable [sic] to send an e-mail to me? A "get aquianted" [sic] type. I will surely respond.

But if you are finding this type of approach odd, tastless [sic], or in anyway [sic] out of line, or that you're simply not interested, I will surely understand and appollogize [sic]. I couldn't think of any other way to give it a try and I thought it couldn't hurt. Take care.

Agent O'Keeffe promptly reported the letter to prosecutors who in turn reported the letter to the court and opposing counsel. Thereafter, Smith and Bates moved for a new trial based on Juror #9's claimed bias; Bates also requested an evidentiary hearing. Both sides submitted briefs on the issue and argued the motion before the district court ruled. After considering the evidence, the district court denied the motion without conducting an evidentiary hearing.

With Juror #9's letter in hand, the district court understood the exact nature and scope of the bias allegation. *Cf. Saya*, 247 F.3d at 935. The district court examined the content of the allegations from the letter and never doubted the credibility of the source to which defendants pointed — Juror #9 himself. *Cf. Hanley*, 190 F.3d at 1031. In analyzing the seriousness of the allegations, the district court took into account that (1) Agent O'Keeffe was one of the last witnesses to take the stand after six weeks of trial (thereby limiting her influence on Juror #9), (2) Agent O'Keeffe was a summary witness who presented no new evidence, (3) other than the "kind aura" statement, there was "absolutely no tangible evi-

dence that there was any extraneous information or extraneous influence on this juror by anyone," (4) there was "absolutely no evidence that Juror Number 9 did anything inappropriate during the trial" (noting at most a smile was exchanged), and (5) there was no evidence filed by defendants or declarations from any of the jurors that there was extraneous information or influence.

The district court logically reasoned it was unlikely that this juror was attempting to impress Agent O'Keeffe by finding defendants guilty, since he voted to acquit Charlotte Wadsworth, to acquit Bates of 88 out of 111 counts against him, and to acquit Smith on three counts. Furthermore, Juror #9 explicitly wrote Agent O'Keeffe that he had no desire to discuss the case with her, making the argument that he was trying to impress her with guilty verdicts even more attenuated.

An evidentiary hearing to listen to Juror #9's testimony regarding the trial would likely not have produced any valuable information. When inquiring into the validity of a verdict, pursuant to Federal Rule of Evidence 606(b),

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.*

(emphasis added). Thus, even if the juror's thought process was biased with his alleged "infatuation" with Agent O'Keeffe, the court was not free to hear evidence in this regard. Further, it was clear from Juror #9's letter that there

was neither extraneous prejudicial information from Agent O'Keeffe (a smile can hardly be so deemed), nor "outside influence [that] was improperly brought to bear."

**[28]** The district court did not abuse its discretion in denying the evidentiary hearing and a new trial. Even if this juror had something of a crush on Agent O'Keeffe, his letter made clear that he diligently performed his duty as a juror, never speaking to Agent O'Keeffe during the trial, and at most exchanging a smile with her. It is unlikely that any trial goes by without one juror finding one witness nice or attractive. The only unusual thing about this case is that Juror #9 put his feelings in writing. The district court was well within its discretion in finding no evidence of juror misconduct and no extraneous influences on the juror, such that an evidentiary hearing was not required.

### B.   *Juror #1's Alleged Intimidation*

The district court also denied defendants' motion for a new trial based on the alleged intimidation of Juror #1. During the trial, Juror #1 wrote an e-mail explaining her disagreement with the foreperson regarding her approach to analyzing the mail and wire fraud counts without first considering the basis of the conspiracy charges. She explained:

> I have been criticized by the foreperson and consequently have felt intimidated into proceeding on a ruling on more than two dozen counts without having first established the underlying business relationship of the defendants. She criticized me for wanting to review my notes; she criticized me for wanting to look at the evidence, and specifically she criticized me for wanting to look at evidence relative to count one. At one point she accused me of having already made up my mind because I suggested that we consider the prosecution's foundation for the case. The foreperson then threatened to throw me off the jury.

The district court questioned Juror #1 outside the presence of the other jurors about her feelings of intimidation. After the juror reiterated her concerns from the e-mail, the judge told her:

> Each of you [jurors] must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.
>
> Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right. It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Although Juror #1 told the judge that she did not believe her decisions were made based upon her own beliefs up to that point, after hearing the above instruction, she felt able to return to deliberations and make future decisions (including those on verdicts that may have been rendered previously) based on her own conscience and belief.

The attorneys for defendants and the government then had a long discussion about whether the jury should be instructed to start deliberations anew or be instructed again on their role as jurors, and whether to keep Juror #1 on the jury. The court then brought Juror #1 back in, and asked more questions regarding whether she still felt intimidated, to which she answered she did not. The court was convinced that Juror #1 made "very clear that she is not intimidated at this point, that she understands her duty as a juror, and that she is ready to continue her deliberations in this case after the entire jury is

reinstructed as to 34 and 39" (which had been reread to Juror #1).

**[29]** Smith argues that the foreperson's bullying of Juror #1 "demonstrates that the jury was not impartial and that the jury deliberation process was not functioning properly." However, if anything, the foreperson's misconduct ran to the defendants' favor by discounting the prosecution's theories. This alleged misconduct was thoroughly investigated by the district court, and its effect cured by ensuring that Juror #1 no longer felt intimidated. The district court did not abuse its discretion in refusing a new trial on this ground.

## VII. *Duplicity and Multiple Conspiracies Jury Instruction*

Before trial, Smith moved to dismiss Counts 1, 25, and 64, the three conspiracy charges of the indictment, arguing that each one encompassed multiple conspiracies (and thus that each one was duplicitous). Bates joined this motion. Defendants disputed that there was one overarching conspiracy within any of these counts because the overt acts covered six alleged UBOs, with differing: (1) time periods, (2) identity of defendants involved, (3) identity of taxpayers involved, and (4) specific transactional facts.

The government opposed the motion, arguing that Counts 1, 25, and 64 each contained a singular conspiracy. As to Count 1, the government asserted that defendants entered into an agreement to impair and impede the IRS through the use of UBOs "in a fashion which knowingly and intentionally understated income and overstated legitimate deductible expenses." Although the UBOs were marketed to 249 or more taxpayers, the government argued that the Count 1 conspiracy was not "taxpayer specific"; it involved "one agreement, regardless of the number of taxpayers whose income tax return[s] were involved." As to Count 25, the government argued that there was one agreement to use the mail and interstate wire communications in furtherance of a scheme to

defraud. Finally, Count 64, though involving different money laundering sections (18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B), and 1957), encompassed only one agreement to engage in money laundering. The government summarized its argument as "[o]ne agreement; one count."

After considering the pre-trial briefs and supplemental briefs of all the parties on this issue, the district court found the indictment not duplicitous as to Counts 1, 25, and 64. After the trial, during the jury instruction conference, Smith renewed the motion to dismiss these counts, claiming that the government had "not been able to show an overarching conspiracy but rather ha[d] shown individual conspiracies." The district court denied the motion, and sustained the government's objection to a multiple conspiracy instruction.

The district court's ruling that there were no duplicitous counts appears correct, and defendants do not dispute it on appeal. Instead, defendants now argue that the district court erred in denying the request for the multiple conspiracy instruction. However, this argument is not based on any of the pretrial briefing arguments or post-trial jury instruction conference arguments that *each* conspiracy count encompassed multiple conspiracies. Rather, defendants argue (based on their multiplicitous sentence argument) that three conspiracy counts inherently require a multiple conspiracy instruction.

This argument was never made below, and thus was waived. Even if it were not waived, the argument misconstrues the nature of a multiple conspiracy instruction, which pertains to multiple conspiracies *within* a conspiracy count. The district court correctly denied the multiple conspiracy instruction.

## VIII.   *Application of Sentencing Guidelines*

Smith and Bates argue that the district court erred in enhancing their sentences under the Sentencing Guidelines.

"Even though the Guidelines are no longer mandatory after the Supreme Court's decision earlier this year in *United States v. Booker*, 125 S. Ct. 738 (2005), the district court should still consult them for advice as to the appropriate sentence, *id*. at 767." *United States v. Kimbrew,* 406 F.3d 1149, 1152 (9th Cir. 2005). We review "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of this case for abuse of discretion, and the district court's factual findings for clear error." *Id*. at 1151 (citation omitted).

## A.   *U.S.S.G. § 3D1.2*

[30] Smith and Bates argue the district court erred by grouping the tax counts separately from the money laundering and mail and wire fraud counts, which resulted in a two-point increase in each of their offense levels. The Guidelines provide that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. In part, "same harm" means the counts involve the "same victim." *Id*. § 3D1.2(a), (b).

The government argued at sentencing that the counts in question encompassed different harms and different victims. The Presentence Investigation Reports ("PSRs") for Bates and Smith both found that the victim as to the tax fraud counts is the United States government, whereas the victims as to the mail fraud and wire fraud counts "are the clients who had their money stolen by the defendants." The district court adopted the PSRs' findings and declined to group all counts together.

[31] The district court's factual finding that multiple victims were involved is not clearly erroneous, and the district court did not abuse its discretion in applying U.S.S.G. § 3D1.2.

B.  *U.S.S.G. § 3B1.1(c)*

The U.S.S.G. § 3B1.1(c) aggravating role two-level enhancement applies "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving less than five participants and that was not otherwise extensive. Smith's PSR recommended this enhancement because Smith managed the activities of Christopher Bates and Charlotte Wadsworth. The district court's adoption of this factual finding was not clearly erroneous.

## IX.  *Increasing Smith's Sentence Based on Allocution*

Near the end of Smith's sentencing hearing, the district court stated its intention "to depart somewhat from the Probation Officer's recommendations and to sentence Mr. Smith to the low end of [the] guideline range of 121 months imprisonment." Defense counsel and the prosecution presented nothing further. Then, the district court asked whether Smith wished to address the court; Smith did.

Smith made a lengthy speech, denying (1) the jurisdiction of the district court, (2) that he had any connection to any state or the United States, (3) the existence of the United States, California, Sacramento, the district court, the prosecutor, defense counsel, Judge England, a list of UBOs, and even himself, and (4) that he is a Fourteenth Amendment "person." Smith contested that the offenses he was charged with were committed by anyone, and argued that the prosecution had "failed to show any actual or threatened injury as a result of the challenged conduct." Smith demanded that the court "reconsider and withdraw the proposed sentence, reverse the conviction, enter judgment of acquittal, vacate the charges against [him], quash the indictment, dismiss the complaint and otherwise . . . set [him] free."

The district court responded to Smith's speech:

The defendant's statements to the Court that were just read have made it abundantly clear to this Court that Mr. Smith has absolutely no remorse for his actions. And further, he has directly challenged this Court and its ultimate authority. Accordingly, I find that this defendant is appropriate to be sentenced not at the lower end of the guideline range but at the upper end.

Mr. Smith apparently just simply does not get it. He is a direct and continuing threat to the financial safety of the public. And this Court has the belief, well-founded belief that if he were to be released from custody at any earlier time, he would immediately resume the criminal activity for which he was on trial here in this court.

The district court then sentenced Smith to 151 months instead of 121 months. Smith's counsel made no objection to the increased sentence.

[32] Smith argues that his First Amendment free speech and Fifth Amendment due process rights were violated because he was punished with a higher sentence for expressing his views on the district court's lack of jurisdiction. But the district court made it clear that it was increasing the sentence based on Smith's lack of remorse, and his threat to the financial safety of the public when released. These are legitimate sentencing factors under 18 U.S.C. § 3553(a), which include considering the "characteristics of the defendant" and the need for the sentence "to promote respect for the law," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."

[33] The district court may indicate a tentative sentence and then hear from the defendant before making a final sentencing determination. *See United States v. Laverne*, 963 F.2d 235, 236 (9th Cir. 1992). The district court here "was able to con-

sider the defendant's statement and was free to alter its view
of the sentence if the defendant offered a sufficient reason for
changing its view." *Id*. at 237. That the district court consid-
ered Smith's lack of remorse in sentencing him is by no
means a novel concept. *See United States v. Malquist*, 791
F.2d 1399, 1402-03 (9th Cir. 1986) ("inclusion of [defen-
dant's] lack of repentance in the court's sentencing calculus
was permissible"). The district court did not err in taking
Smith's statement into consideration for sentencing. The Sen-
tencing Guidelines, in either their mandatory or advisory sta-
tus, do not insulate a defendant from his or her own
foolishness.

## X.   *Reconsideration of Bates's sentence*

   At sentencing, the district court stated its tentative intention
to sentence Bates at the low end of the guideline range (121
months) because of Bates's medical condition. The govern-
ment made "another pitch for the mid-range of 136 months"
because "the defendant's criminal history is actually substan-
tially understated." Although Bates was found not criminally
liable, he was found civilly liable for fraud in the amount of
$4,687,984.71.

   The district court sentenced Bates to 136 months, explain-
ing: "I have reconsidered my initial decision, and I am going
to follow the recommendation of Probation for 136 months."
The court further stated:

      The Court wants to make it clear that the reconsid-
   eration of the sentencing is based upon not only the
   words that Mr. Twiss [AUSA] stated here today in
   open court, but also a further review of the Presen-
   tence Report and also the Court's own recollection
   of the magnitude of the scheme in which Mr. Bates
   was involved, which led to the losses of substantial
   sums of money, upwards of 1.8 million dollars, from
   varying individuals and ages, some who have lost

their entire retirement system under this scheme of unincorporated business organizations.

And I want the record to reflect that as being the basis for the Court following the mid-term recommendation of 136 months.

Thus, the district court relied at least in part on proper factors, such as the magnitude of the scheme and the loss incurred by victims, in determining placement in the sentencing range. *See* 18 U.S.C. § 3553(a)(2)(A) (sentence "to reflect the seriousness of the offense"). Furthermore, the Guidelines state that the "history" of the defendant may be considered. *Id.* § 3553(a)(1). A civil judgment against a defendant could be a factor in the defendant's history. Thus, it does not appear that the district court relied on improper factors in sentencing Bates to the middle of the Guidelines range.

## XI. **Booker** *Issue*

**[34]** Both Smith and Bates argue that they must be resentenced under *Booker* because their sentences are based on facts not found by a jury beyond a reasonable doubt. Because the defendants did not challenge their sentences on Sixth Amendment grounds in the district court, and because the record in this case does not "provide a reliable answer to the question of whether the judge would have imposed a different sentence had the Guidelines been viewed as advisory," we grant a limited remand to the district court to answer this question. *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

## XII. *Ex Post Facto Issue*

Smith and Bates argue that upon resentencing, their sentences must be capped by the maximum terms of imprisonment authorized by the unenhanced base offense levels, under *ex post facto* principles. We have rejected that argument in

*United States v. Dupas*, 2005 U.S. App. LEXIS 15938 (9th Cir. 2005).

## CONCLUSION

For the foregoing reasons, the judgments of conviction are affirmed and the cases are remanded pursuant to *Ameline*.